UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                No. 04-CR-80292
                                              Hon. Gerald E. Rosen

vs.

CASSANDRA LATELY and
RODERICK WAYS,

                Defendants.
_____/

OPINION AND ORDER DENYING DEFENDANTS'
MOTION TO SUPPRESS EVIDENCE

        At a session of said Court, held in
        the U.S. Courthouse, Detroit, Michigan
        on        December 13, 2005

        PRESENT:  Honorable Gerald E. Rosen
                              United States District Judge

## I. INTRODUCTION

Defendant Cassandra Lately is charged, along with a co-defendant, Roderick Ways, in a one-count indictment with conspiracy to possess with intent to distribute approximately 20 kilograms of cocaine. The charges against Defendants Lately and Ways arise out of events that occurred from March 25 through March 31, 2004.

This matter is presently before the Court on Ms. Lately's motion to suppress the cocaine and other evidence of narcotics trafficking which was seized during the March 31, 2004 search of a residence at 4442 South St. Louis Street in Chicago, Illinois; the

(detached) garage of the Chicago residence; and the Buick Riviera that was parked in the garage.  The 20 kilos of cocaine were found in a hidden compartment in the Buick parked in the garage.  Co-Defendant Roderick Ways, who was the owner of the Buick at the time of the search, has joined in Defendant Lately's Motion.

The Court conducted a two-day evidentiary hearing on this matter on January 20 and 21, 2005, at which hearing the Court heard the testimony of DEA Special Agents Robert Glynn and William Maloney; Jack Howard, a Cook County, Illinois State Attorney's Office Investigator, detailed to the Chicago Drug Enforcement Administration Task Force; and Defendant Cassandra Lately.  The Court also received into evidence a number of exhibits.

At the close of the hearing, the Court ordered the parties to submit supplemental briefs related to the issue of Defendants' standing to challenge the search of the Buick Riviera.  The parties have complied with the Court's order for supplemental briefing.

Having reviewed and considered the parties' briefs and having further considered the testimony given and evidence received into the record, the Court is now prepared to rule on this matter.  This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

Acting on information from a "reliable source" that Cassandra Lately would be transporting cocaine from Chicago to Detroit, DEA agents placed Cassandra Lately under surveillance on March 25, 2004.  The surveillance of Ms. Lately began in Detroit and

continued in Chicago, Illinois.

On March 26, 2004, Ms. Lately was observed leaving the Extended Stay America Suites hotel near the Detroit Metropolitan Airport and was followed by agents to a Shell gas station at the corner of Warren Avenue and the Southfield Freeway where Lately was observed making contact with the driver of a black GMC Yukon Denali (who was later identified as Defendant Roderick Ways). Lately was observed looking through a black duffle bag with red trim. She then got into Ways' vehicle with the duffle bag and rode with Ways to his home on Memorial Street in Detroit.

Five days later, on March 31, 2004, agents watched Ms. Lately leave the Extended Stay America Suites in her own car, a Pontiac Grand Prix, and drive to Ways' home on Memorial Street. About an hour later, the agents saw Lately and Ways leave the residence and depart in Ways' Denali. Ways drove Lately to Metro Airport, where she purchased a one-way ticket to Chicago Midway Airport. Detroit DEA Dan Krauss contacted DEA agents in Chicago and advised them of Lately's impending arrival and the Chicago agents then picked up the surveillance of Ms. Lately after she arrived at Midway.

Agent Robert Glynn testified that he was the DEA agent in Chicago who received the information from Agent Krauss and that he and Agent Jack Howard were two of the agents who conducted the surveillance of Ms. Lately in Chicago. Glynn testified that he observed Lately get off the plane in Chicago, go to the outside departure-arrival area,

make a phone call on a cellular phone, and get picked up outside the airport by two hispanic men, subsequently identified as Raul Sanchez and Juan Rodriguez. Agent Glynn continued surveillance of Ms. Lately as the two men drove her in a white Nissan Maxima to a two-family flat at 4442 South St. Louis Street in Chicago.

Defendant Lately and Juan Rodriguez entered the residence through the back entrance. (Raul Sanchez remained in the car.) Five minutes later, Rodriguez was observed exiting the house and enter the detached garage of the residence in which the agents could see a car parked. Shortly thereafter, Rodriguez exited the garage, clutching his jacket. He re-entered the white Maxima and he and Sanchez then drove off utilizing what the agents characterized as "counter-surveillance techniques," i.e., driving erratically, going fast then going slow, pulling over to the side of the street and looking around over their shoulders, and then driving off again. Agent Glynn and some of the other agents followed them for a time but eventually lost them when the two stopped the car in a residential area and fled on foot. The agents then returned to continue surveillance of 4442 South St. Louis.

Agent Glynn went to the back of the house, while Agents Howard, Mostek and Cunningham went to the front of the house, knocked on the door of the first floor residence and interviewed the first-floor resident, Julio Crespo. Crespo provided Agent Glynn and Agent William Maloney written consent to the agents to search both his flat, the basement, the attic, and the detached garage. Glynn testified that nothing was found

in Crespo's flat, but in the basement the agents found a "kilo press," a heat sealer and other drug paraphernalia.

Agent Glynn testified that it was around 11:30 a.m. when he went up the back stairs of the St. Louis Street residence along with two other agents -- Agent Cunningham and Agent Sterling Terry. Glynn testified that all three agents were in plain clothes. Defendant Lately answered the door. Agent Glynn testified that, because the building was not secure and because the agents did not know who they were dealing with, when Glynn went up the back stairs, he had his gun out of its holster, holding at his side.

After identifying themselves as federal agents and informing Ms. Lately that she was not under arrest, Lately agreed to speak with them. According to Glynn, when asked what she was doing there, Defendant Lately told the agents that she was visiting a friend. But when Glynn asked she could not tell Glynn her friend's name. Glynn testified that the red and black travel bag that he had observed Lately carrying in the airport was on the floor outside the hallway, right outside the bedroom of the apartment so Glynn assumed that Lately was staying there.

Glynn noted in his report of the matter that Ms. Lately appeared nervous and was looking around a lot. However, notwithstanding her apparent nervousness, Glynn testified that Ms. Lately gave the agents permission to search the apartment. Glynn testified that at that time Agent Maloney joined them upstairs. Maloney had the Consent to Search Form signed by Mr. Crespo in his hand and when Ms. Lately verbally

consented to the search of the flat, they asked her to sign the same Consent to Search Form signed by Crespo and she complied.[1] However, after Lately signed the form that Crespo had signed, the agents made the determination that Crespo and Lately did not have any involvement with one another and because the upper and lower flats appeared to be two separate residences, Agent Glynn went to his car and got a blank Consent to Search Form, filled in pertinent information regarding the areas for which consent was sought, and presented the form to Defendant Lately to sign, and she signed it. This form asked for Lately's consent to search the residence, the garage and the contents.

Inside the flat, the agents found, among other things, 120 grams of cocaine.

Agent Glynn testified that while two agents conducted the search of the upstairs flat, he and Agent Jack Howard went to search the garage. In the garage, the agents saw a 1997 Buick Riviera bearing a Michigan license plate. (It was later determined that the car was registered to a "Mark Williams" at 16626 James Couzens Hwy., in Detroit.) The agents returned to the flat to ask Lately about the car. She told them that she was going to drive the car back to Detroit. She then provided both verbal and written consent (by executing a third Consent to Search Form) for the agents to search the Buick Riviera.

Agent Glynn testified that the Buick was not locked and the driver's side window

---

[1] Agent Glynn testified that he did not have any blank forms with him; they were in the car and Glynn did not want to leave the scene to go to his car, which was parked a half a block away, to retrieve them. Therefore, he had Ms. Lately sign the same form that Julio Crespo had signed.

was rolled down. Glynn entered the car and discovered a sophisticated false compartment or "trap" hidden behind the back seat. Inside that compartment, he found twenty plastic-wrapped bricks of cocaine weighing approximately one kilogram each.

After finding the large quantity of cocaine, the agents returned to the second floor flat and placed Lately under arrest. She was read her *Miranda* rights by Agent Howard but she voluntarily waived those rights, signed a Waiver of Rights form, and agreed to cooperate.

Agent Howard testified that he interviewed Ms. Lately after she voluntarily waived her rights and prepared a handwritten statement based upon that interview for Ms. Lately to sign, which she did. Lately told the Agent Howard that she was a drug courier for an individual named "Mark Williams" (later determined to be an alias used by Defendant Roderick Ways.) In the written statement which she signed, she stated that she had made approximately 50 trips from Chicago to Detroit during the immediately preceding nine months driving cars in which cocaine was hidden for "Mark Williams."

Included within her statement, was Ms. Lately's written acknowledgment:

> I have made this statement of my own free will. No threats or promises have been made to me in exchange for this statement. I have read this statement aloud in the presence of Task Force Agent Howard and Special Agent Fergus.

Defendant Lately also testified at the evidentiary hearing and her testimony is not entirely consistent with the testimony of Agents Glynn, Maloney and Howard.

Ms. Lately claimed that the agents did not knock on the back door to the upstairs

7

flat; she said that the door was open and the agents just walked in uninvited. She testified that she was in the living room when the officers entered which she testified was about 30 feet away from the back door that opened into the kitchen of the flat.

She further claims that she was never asked, either verbally or in writing, for consent to search anything in the house other than her travel bag and her purse. According to Ms. Lately, she told the agents that she could not give them permission to search the flat because it was not her apartment. With regard to the car, Ms. Lately further testified at one point in her examination that she did not give the agents consent to search the car until after she had already been told that they had found drugs in the car. Later in her testimony, however, she said that she consented to the search of the car after she learned that the agents had *seen* the car in the garage.

Given the fact that Ms. Lately changed her story several times during the course of her examination, the Court finds her testimony that she did not consent to the search of the premises or the car not credible. On the other hand, the Court wholly credits the testimony of the agents with regard to Ms. Lately's consent to search the residence, garage and car, and also credits their testimony with regard to the timing of Ms. Lately's consent and the search conducted by the agents.

Ms. Lately also admitted under oath that her encounter with the agents on March 31, 2004 was not her first encounter with law enforcement authorities. She admitted that she had been arrested before, that she knew her *Miranda* rights, and knew she did not

have to talk to the police and had a right to have a lawyer present before talking to the authorities. She further testified that she gave the written statement to Agent Howard because she was hoping at that point that if she cooperated the authorities would go easy on her. But she admitted that no one made any promises to her nor did anyone threaten her.

Defendant Lately now seeks to suppress the drug evidence and her statement arguing that her consent was not voluntarily given and, therefore, the searches of the residence, garage and the Buick Riviera were illegal and all of the evidence obtained as a result must be suppressed.

### III. DISCUSSION

A. DEFENDANTS LATELY AND WAYS LACK STANDING TO CONTEST THE SEARCH OF THE PREMISES

It is well-settled that a person has no reasonable expectation of privacy so as to entitle him to challenge the constitutionality of a search of a residence where he is neither a resident nor an overnight guest in that residence. *See Minnesota v. Carter*, 525 U.S. 83 (1998). *See also Rakas v. Illinois*, 439 U.S. 128, 130, 99 S.Ct. 421 (1978). Here, Defendant Lately herself admitted that she did not reside in the upper flat at 4442 South St. Louis nor was she an overnight guest. She was only there as part of "business" arrangement -- to pick up the Buick Riviera and drive it back to Michigan. Thus, this case is on all fours with *Carter* where the defendants who were not staying in the apartment but rather were only there to package illegal drugs lacked standing to contest

the search of the apartment or to challenge the seizure of the drugs that were found in the apartment.

Mr. Ways relation to the Chicago residence is even more attenuated. Like Ms. Lately, Ways has no ownership or possessory interest in the house or the garage. Moreover, Ways was not at 4442 St. Louis at the time of the search; indeed there is no evidence that he was even in Chicago at that time. Thus, under *Rakas* and *Carter*, neither Lately nor Ways has standing to challenge the searches of the premises.

B.  DEFENDANTS ALSO LACK STANDING TO CHALLENGE THE SEARCH OF THE CAR

The Government has similarly argued that neither Lately nor Ways has standing to challenge the search of the Buick Riviera in which the drugs were found. With respect to Defendant Lately, the Government argues that Lately lacks standing to contest the search of the Buick because she did not own the car and because she only used it for "business" purposes, she could not have had a reasonable expectation of privacy in it. With respect to Defendant Ways, the Government contends that Ways forfeited any expectation of privacy in the vehicle by relinquishing possession of it to Defendant Lately.

It is well-settled that "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." *Rakas*, *supra*, 439 U.S. at 133-134. "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id*. at 134.

The burden is on the defendant to establish that he has standing to challenge the search or seizure. *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir.1988); *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001). Specifically, "[t]he defendant must satisfy a two-part test: 1) whether he manifested a subjective expectation of privacy in the object of the challenged search; and 2) whether society is prepared to recognize that expectation as legitimate." *United States v. Sangineto-Miranda, supra*, 840 F.2d at 1501 (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986)).

By application of the foregoing authorities, the Court finds that neither Defendant Ways nor Defendant Lately has standing to contest the search of the Buick Riviera. First, with respect to Defendant Ways, although Ways is the registered owner of the subject vehicle (under an alias name), ownership is but one fact to be considered in determining whether an individual's Fourth Amendment rights have been violated. *United States v. Salvucci*, 448 U.S. 83, 91, 100 S. Ct. 2547, 2553 (1980). Ownership alone, however, is not dispositive. *Rawlings v. Kentucky*, 448 U.S. 98, 105, 100 S.Ct. 2561-62 (1980); *United States v. Metzger*, 778 F.2d 1195, 1200 (6th Cir. 1985). The Court must look, instead, to the totality of the circumstances and "any precautions taken to exclude others or otherwise maintain a privacy interest" in the car. *United States v. Blaze*, 143 F.3d 585, 590 (10th Cir. 1998). *See also*, *United States v. Smith*, 263 F.3d 571, 584 (6th Cir. 2001) (factors to be considered in determining standing to challenge the search of a vehicle include ownership, possession, and/or control; historical use of the property searched or

11

the thing seized; and the ability to regulate access).

In *United States v. Blanco*, 844 F.2d 344 (6th Cir. 1988), the defendant challenged the search of a car that he had rented but then gave to two of his drug couriers to drive from Florida to Kentucky. A hotel clerk alerted law enforcement authorities to the suspicious nature of the couriers' trip after they checked into the hotel paying cash. The law enforcement authorities subsequently obtained consent from the driver of the car to search the vehicle and found three kilograms of cocaine hidden therein. The defendant who had rented the vehicle challenged the validity of the search. The Sixth Circuit held that the defendant did not have an expectation of privacy in the vehicle because (1) after renting the vehicle, he did not keep possession of it; (2) he gave the only keys to the car to the courier; (3) he had no access to the car after he turned it over to the courier; and (4) he could not exclude others from the vehicle when it was not in his possession. *Blanco*, 844 F.2d at 349. *See also United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 449 (9th Cir. 1983) (where owner voluntarily turned her automobile over to another for his exclusive use and she took no precautions to safeguard any privacy interest she may have had in the automobile, she could not challenge the seizure of cocaine found within the car); *United States v. One 1986 Mercedes Benz*, 846 F.2d 2, 4 (2nd Cir. 1988) ("We believe that by lending the Mercedes to [driver], [the owner] abandoned any legitimate expectation of privacy in the area searched and thus may not no contest the legality of the search.")

By contrast, in *United States v. Jenkins,* 92 F.3d 430 (6th Cir.1996), the court found that the defendant who had let his employee drive a semi-truck that he owned did have a subjective expectation of privacy in the trailer of the rig even though at the time of the search of the trailer in which 319 pounds of marijuana was found hidden behind some produce the rig was in the sole possession of the employee.  Defendant Jenkins testified in a suppression hearing in the district court that his employees were not allowed into his rigs' trailers except when loading and unloading freight and that he usually ordered his trailers locked and sealed to guard against shortages and employee theft (although this particular trailer had inadvertently been left unlocked and unsealed).  Based upon this testimony -- which was not contradicted -- the court found that Jenkins had a subjective expectation of privacy in the trailer of the rig, even though a third-party had physical control of it at the time of the search.  92 F.3d at 434.

Defendant Ways did not testify at the suppression hearing in this case and the only proof he has offered to the Court is his stipulation (through his lawyer) that he owns the subject vehicle and that the 20 kilos of drugs found in the hidden compartment inside the vehicle belonged to him.  On the other hand, the evidence presented at the hearing established that, like the defendant in *Blanco*, Ways did not take any precautions to maintain a privacy interest in the Buick.  Ways did not maintain possession or control over the car.  Rather, five days before the search, he gave the keys to the car to Defendant Lately so that she could drive the car to Chicago.  Ways further instructed

Lately to leave the keys to the car with yet a third individual, Juan Rodriguez. Ways had no access to the car after it left Detroit on March 26, 2004, and he certainly could not exclude others from the vehicle inasmuch as it was placed in the garage of another two states away. Moreover, the testimony of the agents, which the Court credits, was that when they found the Buick in the garage, the driver's side window was lowered, and the driver's side door was unlocked. Thus, anyone with access to the garage could have accessed the car. Ways had no interest in the real property at 4442 St. Louis Street, and at least one other individual, Julio Crespo who rented the lower flat there, also had access to the garage. Based on the totality of these circumstances, the Court finds that Ways had no subjective expectation of privacy in the Buick once he turned it over to Defendant Lately.

The Court similarly finds that Defendant Lately had no subjective expectation of privacy in the Buick. As indicated, Lately testified that she drove the Buick to Chicago on March 26, 2004 and gave the keys to the car to Juan Rodriguez, and then was driven back to the airport to catch a flight back to Detroit. On March 31, Lately flew back to Chicago where she was picked up at the airport by Juan Rodriguez and another individual, Raul Sanchez, and driven to 2442 St. Louis Street where she was to wait until the keys to the Buick were given back to her so she could drive the car back to Detroit.

Lately admitted having no ownership interest in the Buick. She testified that the car belonged to her co-defendant, Roderick Ways. Nor did she have any access or

14

control over the vehicle while it was in Chicago; she only had control over the car while driving it between Detroit and Chicago. Access and control over the vehicle was relinquished to Rodriguez once the car was brought to Chicago. (Indeed, there is no evidence to indicate that Lately even knew that the Buick was in the garage at 2442 St. Louis on March 31, 2004 before the agents arrived.) She was not to have access or control over the vehicle until Rodriguez returned the keys to her later that day, which never occurred.

For all of these reasons, the Court finds that Defendants Lately and Ways lack standing to challenge the search of the Buick Riviera.

C. <u>LATELY VOLUNTARILY CONSENTED TO THE SEARCH OF THE CAR</u>

Even assuming *arguendo* that Defendant Lately had sufficient possession and control over the Buick to establish her standing to challenge the search of the vehicle, the credible testimony presented at the suppression hearing establishes that Lately voluntarily consented to the search.

The test for voluntariness of a statement (or of a consent to search) is whether it was the product of free and rational choice. *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 231, 248 (1973) ("Consent searches are a part of the standard investigatory techniques of law enforcement" and such a search is deemed valid when it is "voluntarily given, and not the result of duress or coercion, express or implied.") Determining voluntariness requires a

two-pronged analysis taking into account the totality of the circumstances. *United States v. Calhoun*, 49 F.3d 231, 235 (6th Cir. 1995); *United States v. Murphy*, 763 F.2d 202 (6th Cir. 1985), *cert. denied*, 474 U.S. 1063 (1985). The inquiry considers (1) the conduct of law enforcement officials in creating pressure on the defendant and (2) the defendant's capacity to resist that pressure. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 520 (1986). In *Colorado v. Connelly*, the Supreme Court emphasized that official coercion is a necessary element of the two-pronged totality of the circumstances analysis. *Id*. at 170.

The Sixth Circuit has enumerated a number of other factors that a court should consider when determining the voluntariness of a defendant's statement or consent to search. These factors include (1) the age, education, and intelligence of the defendant; (2) whether the defendant was informed of his constitutional rights; (3) the length of the interrogation; (4) whether the questioning was repeated and prolonged; and (5) whether the officers utilized physical punishment, such as the deprivation of food or sleep. *See Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994), (citing *Schneckloth v. Bustamonte*, *supra*, 412 U.S. at 226).

In this case, there is no allegation of any such coercive activity by the government agents involved with Ms. Lately on March 31, 2004. There is no evidence to suggest that Defendant Lately was physically or verbally threatened, there was no prolonged interrogation, and no deprivation of any physical necessities. Indeed, Defendant Lately admitted at the suppression hearing that, at the time she consented to the search of the

car, no one threatened her, no one made any promises to her and no one forced her to give her consent. *See* Hrg. Tr. pp. 111-113.

Lately further admitted at the suppression hearing that this was not her first encounter with law enforcement authorities; she had previously been arrested, charged and convicted of a crime and she knew her rights. Tr. pp. 91-92. She testified that she knew she did not have to talk to the agents and knew that she could refuse to consent to a search. *Id.*

Furthermore, the testimony of the agents -- which the Court fully credits -- was that they did not search the car until they received Ms. Lately's consent. Defendant Lately testified that she first gave her consent to search the car *verbally*, after she heard the agents talking about having seen the car in the garage.[2] She later provided her consent in writing on a standard consent form. Lately testified that she knew what she was signing because she had previously signed a consent to search form. Tr. p. 108. Based upon the foregoing, the Court finds that Defendant Lately voluntarily consented to the search of the Buick Riviera.[3]

---

[2] Although at one point in her testimony, Lately said that she did not consent until after she knew that the agents had found the drugs in the car, she later clarified that statement and testified that she consented after she knew the agents had seen the car in the garage.

[3] Although Defendant Lately testified that she initially did not consent to the search because she did not think that she could consent to the search of the car since it did not belong to her -- it belonged to her co-defendant, Roderick Ways -- whether Lately possessed the legal capacity to consent is a question of law for the Court to decide. And, the law is clear: a third party in sole possession and control of a vehicle has the authority

For all of the foregoing reasons, the Court finds that the search of car was valid and, accordingly, suppression of the drugs found in the car is not warranted.

D.   DEFENDANT LATELY'S STATEMENT TO AGENT HOWARD WAS ALSO VOLUNTARILY GIVEN

The Court also finds that Defendant Lately's waiver of her *Miranda* rights and the detailed statement she gave to Agent Howard after the drugs were found in the car and Ms. Lately was placed under arrest were voluntary. Ms. Lately acknowledged the voluntariness of her waiver of rights and of her statement in writing on March 31, 2004. She reiterated in her testimony at the suppression hearing that neither Agent Howard nor the other agent, Agent Fergus, who was with him at the time that the statement was made threatened her or used physical force against her. Tr. pp. 113-114. She further testified

---

to consent to its search. *United States v. Dunkley*, 911 F.2d 522, 526 (11th Cir. 1990); *United States v. Morales*, 861 F.2d 396, 399 n. 8 (3rd Cir. 1988); *United States v. Diaz-Albertina*, 772 F.2d 654, 658-59 (10th Cir. 1985), *cert. denied*, 484 U.S. 822 (1987). As the court explained in *United States v. Dunkley*, *supra*,

> By relinquishing possession to another, the owner or lessee of the vehicle evidences an abandonment of his or her privacy interest in the vehicle; thus, it is reasonable to conclude that the third party to whom possession was surrendered was also given authority to consent to a search of all areas of the vehicle.

911 F.2d at 526.

Lately's consent is also imputed to Defendant Ways. Where there are two users of a vehicle and one of the users consents to a search, that consent is imputed to his co-user, as well. *See United States v. Carter*, 569 F.2d 801, 083-04 (4th Cir. 1978). Because of their mutual use, the non-consenting user is deemed to have "assumed the risk that the other might consent to a search." *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7 (1973)).

that neither of the agents brandished their weapons or pointed their weapons at her. *Id.* at 114. In fact, she admitted that neither of the agents even had their weapons out at the time that they took her statement. *Id.* In light of Defendant's testimony, the Court finds no basis for suppression of Ms. Lately's statement.

## CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion to Suppress is DENIED.

        s/Gerald E. Rosen
        Gerald E. Rosen
        United States District Judge

Dated: December 13, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 13, 2005, by electronic and/or ordinary mail.

        s/LaShawn R. Saulsberry
        Case Manager